UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| v. ) | |
| ) | Criminal No. 04-10234-NMG |
| **ANDRE PAGE** ) | |
| ) | |
| ) | |

**GOVERNMENT'S MOTION *IN LIMINE* TO ALLOW 404(B)
EVIDENCE AND ITS MEMORANDUM IN SUPPORT THEREOF**

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Assistant United States Attorney William H. Connolly, respectfully moves the Court *in limine* for a ruling regarding the admissibility of evidence of defendant Andre Page's prior drug distribution dealings with co-conspirator Wallstein Allen.

The grounds for this motion are set forth below.

**I.   Summary of Case**

On the afternoon of Saturday, June 5, 2004, an undercover agent ("the UCA") went to the mall at the Prudential Center in Boston and met with defendant Wallstein Allen to complete a previously-arranged cocaine transaction. Pursuant their prior agreement, Wallstein Allen, a resident of New York, was to take delivery of 105 kilograms of cocaine from the UCA. On the day of the transaction, Allen and co-defendants Michael E. Green ("Green"), Andre Page ("Page"), and Aquaya Stephanie Perry ("Perry") traveled to Boston in two separate cars, a Chevrolet

Trailblazer and a Chevrolet Suburban. At the mall, Allen and the UCA met inside a restaurant to discuss the completion of the transaction. While Allen met with the UCA, Green and Page walked around the restaurant, purchased some food, and then took seats at separate tables in the vicinity of the UCA's table, and Perry remained in the restaurant but separate from the others. All three appeared to be engaged in counter-surveillance.

During their discussion, Allen told the UCA that he wanted to make the exchange in the Prudential Center garage but the UCA vetoed that idea, stating that the cocaine was contained in seven large bags. The UCA displayed for Allen part of the wrapping of the cocaine and stated that he had the cocaine stored inside a marina in East Boston. Allen agreed to go to the marina.

Allen and the UCA then exited the restaurant, followed immediately by Green, Page, and Perry. The four defendants retrieved their two vehicles and met up with the UCA outside the garage. The UCA invited Allen to ride with him and his "girlfriend" (a female UCA) to the marina. Allen accepted the invitation, retrieved two bags from the Trailblazer, and entered the back seat of the UCA's vehicle. The bags were later found to contain $200,000 in cash.

The three-car caravan then snaked its way through downtown Boston, through the Callahan Tunnel, and into East Boston. Green drove the Trailblazer, the vehicle from which the money had come,

while Page and Perry drove the Suburban. Upon arrival at the marina, which was at the end of a short, dead-end street, the UCA asked Allen to drive in with his "girlfriend" while he drove the Trailblazer. The UCA then entered the Trailblazer and drove in with Green. The Suburban, containing Page and Perry, made a short drive around the area and parked outside the marina.

Once inside the warehouse at the marina, the female UCA took the two bags containing the money while the UCA directed Allen and Green to the cocaine. The UCA opened up a large container, removed a kilogram of cocaine, and showed the kilogram to Allen and Green. Allen, Green, and the UCA then transferred seven large containers of cocaine into the Trailblazer. As the UCA excused himself to go check on his "girlfriend," other agents moved in to make arrests. Green was arrested inside the warehouse. Allen ran out onto the pier and jumped into the harbor but he was eventually pulled from the water. Page and Perry were arrested at the Suburban.

## II. Rule 404(b) Evidence the Government Intends to Offer into Evidence

The government intends to offer the following evidence through the testimony of co-defendant Wallstein Allen: Allen met Page in 1988. The two lived a few blocks from each other in Brooklyn, New York and would occasionally hang out together. In the summer of 2003, Allen began to provide Page with cocaine. The last time Allen provided Page with cocaine was

3

a couple of weeks before the two were arrested in June 2004. Allen provided Page with varying quantities of cocaine, in amounts between 125 grams and one kilogram. Allen "fronted" the cocaine to Page, who paid Allen after he ("Page") sold the cocaine. Page paid Allen approximately $2,500 for 125 grams, $11,000 for a half a kilogram, and $22,000 for a kilogram.

Allen believes Page was incarcerated at some point and the two began to see each other again in February 2004. Between April 2004 and the time of their arrest in June 2004, Allen provided Page with cocaine on three to five occasions. The amounts of cocaine varied between one-half a kilogram and one kilogram. In May 2004, Allen asked Page to drop off 125 grams of cocaine to a man called "Skinny." Page agreed and did as requested by Allen. A man named Earl (and called Bruce on the street) was used by Allen to make cocaine deliveries. Allen believes that on a number of occasions Page accompanied Earl on cocaine deliveries.

Over Memorial Day Weekend 2004, Allen, Page, Green, and Allen's cousins traveled together to Miami, Florida. Prior to the trip, Allen told Page that he (Allen) needed to go to Boston when they got back from Florida. Allen told Page that he had to take care of business in Boston. Allen contends that Page understood the reference to business in Boston as a reference to drug related activities. Page agreed to accompany Allen on the

trip. The day before the two departed from Brooklyn for Boston, Allen again spoke with Page about the trip. Allen told Page not to drink too much because they were leaving the next morning. Page and Green spent that night at the residence Allen shared with his sister. The next morning, June 5, 2004, Allen spoke with his "uncle", Raymond Austin, over the telephone. During the conversation, Austin informed Allen that the person Austin had planned on accompanying Allen to Boston was unavailable. Allen then spoke with Page, who apparently overheard the conversation, and told Allen that Green would accompany them to Boston. Allen, who had hidden in a closet the $200,000 that was to be used to pay the ship captain, retrieved the bags containing the money prior to leaving the apartment that morning. Page saw the bags carried by Allen and made a comment. In response, Allen told Page that the bags contained the money.

### III. The Evidence of Prior Uncharged Conduct in this Case is Admissible Under Rule 404(b).

The decision to admit evidence under Rule 404(b) is left to the sound discretion of the trial judge, and will be reversed only for abuse of discretion. United States v. Manning, 79 F.3d 212, 217 (1st Cir. 1996). A prior or subsequent bad act is admissible pursuant to Fed. R. Evid. 404(b) if it satisfies a two-part test. First, "the evidence must have 'special relevance' to an issue in the case, such as intent or knowledge,

and must not include 'bad character or propensity as a necessary link in the inferential chain.'" United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).  See also, United States v. Smith, 292 F.3d 90, 98-99 (1st Cir. 2002) (first step in 404(b) analysis is to "assess whether the evidence is specially probative to an issue in the case and is not merely offered to show the defendant's bad character or propensity for crime."). "Special relevance" includes, for example, proof of a person's intent or state of mind to commit a crime, opportunity, knowledge, or absence of mistake.  See United States v. Manning, 79 F.3d 212, 217 (1st Cir. 1996), cert. denied 117 S.Ct. 147 (1996); United States v. Brown, 34 F.3d 569, 573 (7th Cir. 1995)(prior bad acts may be admitted as proof of an element of a crime, such as intent, if the act demonstrates how the defendant's behavior was purposeful rather than accidental), cert. denied 513 U.S. 1167 (1995).

Second, under Rule 403, the evidence "may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  Id.  See also  United States v. Ferrer-Cruz, 899 F.2d 135, 137 (1st Cir. 1990); United States v. Kadouh, 768 F.2d 20, 21 (1st Cir. 1985).  In balancing the probative value and risk of undue prejudice of a defendant's prior bad acts, a district court should bear in mind that Rule 404(b) is a rule of inclusion, not exclusion.  United States v. Carty, 993

F.2d at 1011 (citations omitted) (emphasis added). Thus, the analysis under Rule 403 is not whether the defendant is prejudiced by the admission of prior convictions, but whether the defendant suffers <u>unfair</u> <u>prejudice</u>. <u>Nickens</u>, 955 F.2d at 125 (citations omitted) (emphasis added). <u>See, e.g.</u>, <u>Garcia</u>, 983 F.2d at 1173 (defendant's drug prior arrest admissible because probative value not substantially outweighed by danger of unfair prejudice).

In this case, the proffered evidence clearly bears 'special relevance' to the issue at trial because the government intends to introduce the prior drug distribution to demonstrate both Page's knowledge of the cocaine transaction and to show a relationship of trust between Page and Allen. Thus, the first part of the 404(b) test is satisfied.

As to part two of the 404(b) test, it is clear that the probative value of the proffered evidence is not outweighed by the risk of unfair prejudice. Given the state of the evidence, it is likely that Page's knowledge will be the only contested issue before the jury. As such, it is critically important that the jury understand Page and Allen's relationship in the drug business. Indeed, the First Circuit has found this type of relationship evidence to be admissible under 404(b). <u>See</u> <u>United States v. Flecha-Maldonado</u>, 373 F.3d 170 (1st Cir. 2004) (in prosecution of drug trafficking case, district court properly admitted informant's

7

testimony of prior criminal acts with defendant, including breaking into a house, to explain why defendant initially trusted informant and was willing to participate in criminal venture). Furthermore, the First Circuit has held that prior bad acts may be admissible if they "explain the background, formation, and development of the illegal relationship." United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999) (prior bad act evidence is admissible "to help the jury understand the basis for the co-conspirators' relationship of mutual trust"). See also United States v. Prevatte, 16 F.3d 767, 775-76 (7th Cir. 1994); United States v. Jones, 982 F.2d 380, 382-83 (9th Cir. 1993); United States v. Passarella, 788 F.2d 377, 383-84 (6th Cir. 1986); United States v. Magnano, 543 F.2d 431, 435 (2d Cir. 1976). Here, the illegal relationship is at the heart of the government's case.

## **CONCLUSION**

For the above-stated reasons, the government requests that its motion *in limine* be granted.

        MICHAEL J. SULLIVAN
        United States Attorney

By:
    WILLIAM H. CONNOLLY
    Assistant U.S. Attorney